# IN THE COURT OF APPEALS OF IOWA

No. 3-1257 / 13-1003
Filed April 16, 2014


IN THE MATTER OF THE ESTATE OF
TENA STEENSMA, Deceased.

DALE BRAAKSMA and DANA BRAAKSMA,
     Plaintiffs-Appellants,

vs.

IRENE TIMMERMAN, Individually and as Co-Executor of the Estate of Tena Steensma; ANITA DREESEN, Individually and as Co-Executor of the Estate of Tena Steensma; ARNOLD BRAAKSMA, CHRISTIAN REFORMED WORLD RELIEF COMMITTEE, WORLD HOME BIBLE LEAGUE, SIBLEY CHRISTIAN REFORMED CHURCH, BACK-TO-GOD HOUR, BILLY GRAHAM EVANGELISTIC ASSOCIATION, OCHEYEDAN CHRISTIAN SCHOOL, WESTERN CHRISTIAN HIGH SCHOOL, and DORDT COLLEGE,
     Defendants-Appellees.
_____

Appeal from the Iowa District Court for Osceola County, David A. Lester, Judge.

Following a jury verdict finding certain defendant beneficiaries did not unduly influence the testatrix in the execution of her last wills, the plaintiffs appeal the district court's rulings admitting evidence over their objections. **AFFIRMED.**

Matthew T. E. Early of Fitzgibbons Law Firm, L.L.C., Estherville, for appellants.

Sean J. Barry of Montgomery, Barry, Bovee & Barry, Spencer, for appellees Timmerman and Dreesen, as co-executors.

Lloyd W. Bierma of Oostra, Bierma, Van Engen & Mouw, P.L.C., Sioux Center, for all appellee "charities."

Irene Timmerman, Anita Dreesen, and Arnold Braaksma, individually, appellees pro se.

Heard by Vogel, P.J., and Doyle and Mullins, JJ.

**DOYLE, J.**

Following a jury verdict finding certain defendant beneficiaries did not unduly influence the testatrix in the execution of her last wills, the plaintiffs appeal the district court's rulings admitting evidence over their objections. We affirm.

### I. Background Facts and Proceedings.

From the evidence presented at trial, the jury could have found the following facts. Pete and Tena Steensma married in the 1930's. They were a frugal and deeply religious couple. During their lifetimes, they worked hard, saved money, and accumulated many assets from their joint efforts. They did not have children.

During their marriage, the Steensmas executed several wills and codicils with the assistance of their longtime attorney, Gene Philiph. It was the Steensmas' intent, upon the first of their deaths, to leave their estate to the surviving spouse. Upon the death of the surviving spouse, the Steensmas wished to leave the majority of their assets to charities and missions.

The couple's first will in 1972 left 100% of their estate to charity. However, starting in 1980, the Steensmas changed their wills to include their nephew, plaintiff Dale Braaksma, as a minor beneficiary of their estate. Dale farmed the Steensmas' land with Pete, and the Steensmas regarded Dale as the son they never had. In 1990, the Steensmas executed a new will, leaving 95% of their estate to charity and the 5% remainder to Dale.

Pete passed away in 1998. Tena, then eighty-five-years old, inherited the total estate, worth at least $1,600,000 at that time. Tena felt uncomfortable handling the farm and other business matters, and she asked Dale to manage

her affairs. Shortly thereafter, she appointed Dale her attorney-in-fact via a power of attorney, giving Dale broad authority to manage her affairs. Tena later moved to an independent/assisted-living facility.

In December 2004, one of Dale's siblings, defendant Irene Timmerman, took Tena to a doctor's appointment. While there, Tena told Irene she had not talked to Dale for a long time and that she did not know if she had any money left. Dale and Irene's sister, defendant Anita Dreesen, dropped in thereafter to see how Tena's appointment had gone, and Tena again expressed worry to both her nieces about whether she would be able to continue to afford living at the facility. Tena's nieces suggested Tena contact her investment account representative to inquire about her account's status, and Anita called and scheduled an appointment for the two to meet.

Tena's account representative Keith DeBoer met with Tena, along with Anita, Irene, their other sibling, defendant Arnold Braaksma, as well as the siblings' spouses. Dale and his wife were not present. DeBoer advised Tena that her account had a balance of $300,000, though it had had a million dollars or so in it a few years prior thereto. Tena and her nieces and nephew were shocked. DeBoer also noted Tena had named Dale as the sole beneficiary on the account, with the proceeds of the account to be transferred upon her death to Dale rather than to her estate. Tena acknowledged she had gifted money to Dale over the years, but it was clear she had not "appreciate[d] the totality of what she had done." Tena was angry and embarrassed because she believed she had been "buffaloed" by Dale. She immediately directed DeBoer not to take

any further instructions from Dale, and she changed the beneficiary of her account to her estate.

Thereafter, Tena, Anita, and Irene met with Tena's attorney Philiph to draft a new power of attorney document changing Tena's attorney-in-fact from Dale to Irene. Tena, Irene, and Anita, with their spouses, then met with Dale, his wife, and son at Tena's apartment for a family meeting. Irene, Anita, and Tena asked Dale where the money had gone and requested bookkeeping records for Tena's finances. At times, Dale and his wife reminded Tena she had made many gifts to Dale over the years that they had not requested, but at one point Tena remarked in reply: "Don't kid yourself, Dale could talk pretty smooth about some things that he really wanted. He should have this; he should have that."

On Tena's behalf, Anita and Irene contacted another attorney, Tom Whorley, to see if he could represent Tena. They were concerned about the gifts being made to Dale out of Tena's accounts, and Tena believed Philiph was working more for Dale than her at that point. Whorley requested to meet with Tena and asked her to bring a copy of her will. Anita and Irene, with Tena's permission, obtained a copy of Tena's most recent will from 2000 from the county courthouse, and they gave the documents to Tena. Tena read the documents and was very angry and upset at seeing that her will had many bequests to Dale, including one for $500,000 cash, "[a]nd at that time [Tena] knew there wasn't that much left in [her investment account], and . . . the light switch went on that there wouldn't have been anything left for the charities that were still listed on there." Tena said that will was not what she wanted. Although Tena had signed that will, she still thought her charities would get the major part of her estate. Anita called

Whorley right away because Tena was upset about the will, and he advised that Tena void the will and codicil, which Tena immediately did.

Tena asked Whorley to draft for her a new will. Before meeting with him, Tena reviewed her voided will with Irene and Anita to indicate what parts she wanted to keep or delete. Tena requested Dale be removed as her named executor and replaced with Irene and Anita, and she requested the bequests to Dale, including the $500,000 cash bequest, be removed. Tena also requested the provision providing Dale the first option to purchase her farm be changed from Dale to Anita and Arnold, because she wanted the farm to stay in the family but not with Dale. Additionally, Tena revised some of her charitable-donation percentages to lower amounts, and she added additional new charities. Finally, Tena told her nieces she wanted Irene, Anita, and Arnold (collectively "the siblings") included in her will for them helping her. Ultimately, Tena structured her new will so that 70% would go to charities and the remaining 30% would go to the siblings.

Tena and the siblings met with Whorley numerous times. Tena told Whorley, in the presence of the siblings, that she wanted to include the three in her will. Whorley later met privately with Tena and his law partner, outside the presence of her nieces and nephew, to determine if that was actually what Tena wanted and that she was acting voluntarily and had the requisite mental capacity to do so. She reaffirmed to them that she was not going to include Dale in her new will because she felt she had been "buffaloed" and "swindled" by him and that "he had had enough." The attorneys believed Tena was acting voluntarily

and was of sound mind, but they recommended Tena see a doctor before executing her new will to confirm their beliefs.

Tena met with her doctor at the end of January 2005 for an examination, and he found Tena's "mental capacity was sound, her judgment was sound and he knew of no impediment that would prevent her from executing a will." He provided a letter stating such to Whorley, and on January 31, 2005, Tena executed her new will, leaving 70% of her estate to charities and 10% each to the siblings. Whorley was sure Tena was not unduly influenced in executing that will because Tena "knew what she wanted."

In February 2007, Tena and Anita met with Whorley at his law office for Tena to execute a new will. Tena told Whorley that she had been into Philiph's law office and had signed documents she believed were pertaining to the corporation she had with Dale and his son, but she did not have copies of those documents and she was unsure what she had signed. She wanted a new will "because [she] did not want there to be any question about the contents of [her] will." The new will draft was substantively the same, but Tena added a sentence specifically stating she "made no provisions for [Dale] as he has been the recipient of a substantial amount of [her] money over the years." Whorley and his law partner met with Tena privately to ensure she was executing the will voluntarily and was of sound mind, and they found she was and that she knew what she wanted. Tena then executed the new will.

Tena passed away in October 2010. Her last will from February 2007 was filed for probate thereafter.

In March 2011, Dale and his wife (the plaintiffs) filed a petition to set aside Tena's wills dated after 2003, asserting the wills were the product of undue influence by the siblings. A jury trial on the matter was held in April and May of 2013. The jury returned a verdict in favor of the siblings. The court then entered a judgment in favor of the defendants.

The plaintiffs now appeal.

## II. Scope and Standards of Review.

A will contest is an action at law, so we ordinarily review for errors at law. *Burkhalter v. Burkhalter*, 841 N.W.2d 93, 106 (Iowa 2013). However, "[w]e review the district court's determination of relevancy and admission of relevant evidence for an abuse of discretion." *Mohammed v. Otoadese*, 738 N.W.2d 628, 631 (Iowa 2007). An abuse of discretion occurs when "the court exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* (citations, internal quotation marks, and alteration omitted). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *In re Estate of Rutter*, 633 N.W.2d 740, 745 (Iowa 2001).

Even so, not every erroneous admission of evidence requires reversal. *Mohammed*, 738 N.W.2d at 633. Rather, reversal is only warranted when "'a substantial right of the party is affected.'" *Id.* (quoting Iowa R. Evid. 103(a)). "Although a presumption of prejudice arises when a court receives irrelevant evidence over a proper objection, the presumption is not sufficient to require reversal if the record shows a lack of prejudice." *Johnson v. Kaster*, 637 N.W.2d 174, 181 (Iowa 2001). "This requires a finding that it is probable a different result

would have been reached but for the admission of the evidence or testimony." *Mohammed*, 738 N.W.2d at 633 (citation and internal quotation marks omitted).

### III. Discussion.

Here, the plaintiffs do not challenge the jury's verdict directly. Rather, they assert the district court committed "prejudicial error with respect to [several of its evidentiary] rulings" admitting certain evidence over their objections. They request the jury verdict be reversed and that we remand for a new trial. We address their arguments in turn.

#### A. Expert Testimony.

In their case-in-chief, the plaintiffs supported their contention of undue influence by comparing Pete and Tena's longtime inclusion of only Dale in their past wills to the siblings' new inclusion in Tena's last wills. As part of that evidence, at the plaintiffs' request, the court admitted the Steensmas' and then Tena's individual wills and codicils from 1984 to 2003. Dale testified he filed the will contest because Tena "left nearly a third of her estate to [his] siblings who had never been mentioned in any of her wills prior [thereto]."

The siblings named Certified Public Accountant Gary Peters as an expert, and they sought to have him testify, along with admission of defense exhibits created by him, to "introduce into evidence how much charities would have gotten and how much [Dale] would have gotten on each of the wills from the one before [Pete's] death up to the last will that was prepared by [Philiph]." The plaintiffs requested the expert be excluded, arguing his testimony was irrelevant

and prejudicial.[1]   The plaintiffs asserted the only purpose of the information would be to show Tena's intent at the time the past wills were executed, which would require irrelevant assumptions that Tena meant to leave substantial assets to charity or to show how the past wills influenced her intent to change the wills in 2005 and 2007.

The siblings resisted, noting the plaintiffs' themselves had those past wills admitted into evidence, as well as Iowa's liberal admission of expert testimony. They argued the expert's testimony would help the jury put into perspective why Tena executed new wills awarding the majority of her estate to charities and the remainder to the siblings.  The siblings also pointed out that the plaintiffs' witness Philiph testified he believed the charities stood to receive "hundreds of thousands of dollars" even after Dale was given $500,000 and various assets.

The court agreed with the siblings, stating: "[F]rom the very outset of this case, starting with the testimony of [Philiph], the intent of [Pete and Tena's] wills as to the time period in question, 1998 to 2003, has been an issue."  The court further explained:

> Not only has the intent of [Peter] and Tena been an issue during that time period, but also: Did their wills carry out that intent based on distribution that was set forth therein?  That, again, has been a disputed issue throughout this case.  There's been no objection to the presentation . . . of the documents supporting each party's position.  There has been disputed testimony from . . . the plaintiffs, as to what the distribution under some of those earlier wills would have been.
>         So after hearing [the expert's anticipated] testimony this morning, I do find . . . that the testimony he's going to offer is relevant to those issues that have been previously raised.

---

[1] The plaintiffs did not challenge the witness's qualifications to testify as an expert on the subject matter.

> I do find further that based on [the expert's anticipated and] very limited testimony, the jury would be assisted in understanding the distribution plans under the 1998-2003 wills as they may support the defendants' position on the intent of both Tena and, to a lesser extent, Peter under those wills.
>
> I didn't hear anything, . . . at this point that [the expert] intends to go beyond the four corners of the . . . documents that are involved. My understanding is, he's strictly going to look at the distribution, look at their assets and testify as to what that distribution, within the four corners of the document, would have resulted in. So I don't believe, in my opinion, that that constitutes extrinsic evidence to modify those documents, nor does it constitute parole evidence, to the extent those were raised.

As a precaution, the court gave the jury a limiting instruction explaining that the expert's evidence of the specific numbers were not known nor considered by Tena at the time she executed the 2005 and 2007 wills at dispute in the case.

On appeal, the plaintiffs argue the district court abused its discretion by permitting the expert to testify.[2] They contend:

> It is unimaginable how a fictional distribution on dates in 2000 and 2003 under prior wills has any bearing upon the conduct of [the siblings] in unduly influencing Tena in 2005 or 2007. The only use of this information was to influence the jury to an improper conclusion about Tena's intent vis-à-vis her prior wills.

Upon our review, we find no abuse of discretion by the district court in admitting the testimony. The admission of expert testimony is largely within the discretion of the district court. *Johnson v. Am. Family Mut. Ins. Co.*, 674 N.W.2d

---

[2] The plaintiffs also assert the expert's testimony allowed the siblings to show a different intent on Tena's part from her intent "disclosed by the language of [her earlier wills]." Based upon this theory, the plaintiffs maintain the parol evidence rule applies to prohibit the expert's testimony, and, as a result, the district court erred as a matter of law. *See, e.g., Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 107 (Iowa 2012) ("The parol evidence rule forbids use of extrinsic evidence to vary, add to, or subtract from a written agreement."). However, we agree with the district court that the parol evidence rule is not applicable here because the expert only testified as to the valuations of the assets listed within the four corners of Tena's wills at the time she made those wills. Although Tena may not have known the exact value of her assets, the assets' value was what it was and does not vary, add to, or subtract from her written intent. *See id.*

88, 91 (Iowa 2004). A qualified expert's testimony should be admitted if it will assist the jury in understanding the evidence or determining a fact at issue. *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). "We are committed to a liberal rule on admissibility of opinion testimony, and only in clear cases of abuse would the admission of such evidence be found to be prejudicial." *Heinz v. Heinz*, 653 N.W.2d 334, 341 (Iowa 2002); *Leaf v. Goodyear Tire & Rubber Co.*, 590 N.W.2d 525, 531 (Iowa 1999).

It is presumed that, in the execution of one's will, the testator acts of his or her own free will. *See Burkhalter*, 841 N.W.2d at 96. However, if another substitutes his or her intentions for those of the testator, thereby making the writing the intent of the person exercising the influence rather than that of the testator, undue influence occurs. *See id.* Thus, "[i]n cases involving challenges to wills based upon undue influence, the central issue is whether the acts of the testator were a product of free will or coercion." *Id.* at 105. Where a confidential relationship exists between a testator and a beneficiary and that beneficiary participates in either the preparation or execution of the testator's contested will, a suspicion, though not a presumption, of undue influence arises. *In re Estate of Bayer*, 574 N.W.2d 667, 675 (Iowa 1998). Those seeking to set a will aside based on undue influence carry the burden of proving the essential elements of the action—susceptibility, opportunity, disposition, and causation—by a preponderance of the evidence. *See Burkhalter*, 841 N.W.2d at 105-06.

Although it is possible that the first three elements of undue influence are present, the provisions of the will may nevertheless still be the result of the testator's free will and not the result of undue influence. *Id.* at 106. The testator

has "the right to change her mind regarding distribution of her property." *Bayer*, 574 N.W.2d at 674. Because the testator is not available to testify for his or her self, "a speculative element" is unavoidably introduced into the mix. *Burkhalter*, 841 N.W.2d at 105. Further complicating matters is that "it is not always easy to distinguish ordinary permissible influences on a testator from improper coercion." *Id.* at 105. As our supreme court noted:

> [M]ost persons assert some influence over others, through friendship or familial duties, which may have some tangential effect on their receiving a testamentary benefit. This influence is not tainted. Rather, undue influence must dominate the motives of the testator in executing his will. It must be equivalent to moral coercion.

*Id.* at 106 (citations and internal quotation marks omitted). Consequently, while undue influence may be proved by circumstantial evidence, more than a "scintilla" of evidence is required. *Bayer*, 574 N.W.2d at 671. Persuasion by a defendant against the testator, without more, is not sufficient to show undue influence by a defendant. *Burkhalter*, 841 N.W.2d at 106. Furthermore, "[m]ere suspicion, surmise, conjecture, or speculation is not enough to warrant a finding of undue influence"; rather, "there must be *a solid foundation of established facts upon which to rest an inference of its existence*." *Bayer*, 574 N.W.2d at 671 (citation and internal quotation marks omitted).

Here, it was essentially undisputed by the siblings that they had a confidential relationship with Tena and that they participated in the preparation and the execution of Tena's 2005 and 2007 wills. Generally speaking, as the "foundation of established facts" for which the jury could find "an inference" of the existence of undue influence, the plaintiffs introduced and contrasted Tena's past

favor of Dale and the inclusion of him in her prior wills to Tena's dramatic writing of Dale out of her will for the first time and suddenly including his siblings for the first time, in 2005. *See id.* at 671. To rebut the inference, the siblings, by various uninterested witnesses' testimony, introduced evidence that while Tena did in fact authorize the gifts to Dale and the favorable bequests to him in her wills, she was unaware of the actual value of her assets at the times she made those decisions, and when she found out the amount remaining, she was angry and wrote Dale out of her will. To support their rebuttal of the inference, the siblings had the expert merely put forth an opinion as to the dollar amounts on what Dale sought to inherit under the past wills; the expert did not testify as to his knowledge of Tena's intent. Rather, the valuations spoke for themselves to aid the jury in determining a fact at issue: whether the siblings unduly influenced Tena or whether Tena acted on her own free will to remove Dale and include his siblings and charities instead. We find the district court did not abuse its discretion in the admission of the expert's testimony under the unique facts of this case.

### B. *Other Evidentiary Rulings.*

The plaintiffs also argue the court abused its discretion concerning the admission of other evidence: (1) an insurance contract values quotation with handwritten notes by a trust officer concerning Dale, (2) Anita's testimony of how she felt about being accused of undue influence, (3) a subpoena requesting documents from a bank where Dale, Tena, and his son had executed documents concerning purchasing a corporation and land with Tena's funds, and (4) an affidavit by Tena herself from 2008. We disagree.

In 2005, Tena voluntarily requested a conservatorship be opened for her. Tena and Whorley met with a bank representative, and Tena requested that the bank manage her business affairs. In 2008, Tena signed an affidavit in support of closing the contents of her conservatorship file, requesting the contents be closed to the public. The affidavit states, in part:

> Dale . . . had previously managed my business affairs and it was my belief that [he] exceeded his authority as my attorney-in-fact appropriating substantial amounts of money to himself and members of his family.
> I became increasingly concerned about this appropriation of my assets, and for that reason, I voluntarily requested that [c]onservatorship be established and I terminated the [p]ower of [a]ttorney with [Dale] as my attorney-in-fact.
> . . . [I]nitially the contents of the [c]onservatorship were not sealed and I have been credibly informed that upon filing an annual report, [Dale] used the information provided in the annual reports, made photo copies and discussed this information with members of the community as well as members of my church, which made me feel betrayed and very uncomfortable.

On appeal, the plaintiffs assert "[t]he self-serving and manipulative nature of the [a]ffidavit at a time that is completely irrelevant to the time frame at issue in the case make it wholly irrelevant and inadmissible." However, the very heart of the issue of this case is whether Tena was unduly influenced by Dale's siblings at the time she executed the 2005 and 2007 wills. This affidavit is dated December 2008 and was executed before a disinterested party. Moreover, it affirms Tena's understanding of Dale's past actions; indeed, it refers to the time he had served as her attorney-in-fact via her power of attorney, which she terminated in December 2004, just before the 2005 will was executed. That Tena's account does not support the plaintiffs' assertions in the case does not make the evidence irrelevant and unfair. The plaintiffs asserted claims of undue influence

by the siblings, but Tena's own account evidences her belief that Dale exceeded his authority as her attorney-in-fact. Furthermore, Tena's account supports her choice to omit him from her will, as well as his siblings' account as to why Tena decided to include them in her later wills—gratitude for helping her remove Dale. We do not find the court abused its discretion in admitting Tena's affidavit.

Additionally, upon our review of the remaining evidentiary rulings challenged on appeal, we conclude that even if the district court erred in admitting the evidence, the plaintiffs have failed to show they were prejudiced by the admission of the evidence. As noted above, we are not required to reverse an erroneous ruling that does not prejudice the complaining party. *Johnson*, 637 N.W.2d at 181. "Unfair prejudice is the undue tendency to suggest decisions on an improper basis, commonly though not necessarily, an emotional one." *McClure v. Walgreen Co.*, 613 N.W.2d 225, 235 (Iowa 2000) (citation and internal quotation marks omitted). Here, none of the complained about evidence suggests the jury made their decision on an improper basis, and it is not probable a different result would have been reached but for the admission of this evidence or testimony. Many of these issues were first raised by the plaintiffs and by duplicative evidence. Moreover, the evidence was minor considering the length of the trial, and in light of the numerous witnesses' testimony concerning Tena's intent at the end of her life to exclude Dale from her will. We find no abuse of discretion by the district court.

*IV. Conclusion.*

For the foregoing reasons, we affirm the jury's verdict in favor of the defendants.

**AFFIRMED.**